## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re                                           Jointly Administered
                                                Chapter 7

**PAUL MAHFOUZ AND DEBRA MAHFOUZ**,     Case No. 12-16714-JNF
**FIDAR, INC.,**                        Case No. 12-16709-JNF
**PAUL'S SERVICE, INC.,**               Case No. 12-16710-JNF
**STAR FUEL, INC.,**                    Case No. 12-16712-JNF

        Debtors
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**DONALD LASSMAN, CHAPTER 7 TRUSTEE**,

        Plaintiff                               Consolidated
v.                                              Adv. P. No. 13-1310

**PAUL MAHFOUZ AND DEBRA MAHFOUZ**,

        Defendants
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**ROCKLAND TRUST COMPANY,**

        Plaintiff                               Consolidated
v.                                              Adv. P. No. 13-1311

**PAUL MAHFOUZ AND DEBRA MAHFOUZ**,

        Defendants
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I.    INTRODUCTION

The matters before the Court in this consolidated adversary proceeding are

Counts I and II of the Complaint filed against Chapter 7 debtors Paul Mahfouz and

Debra Mahfouz  (individually, "Mr. Mahfouz" and "Mrs. Mahfouz," and jointly, the

1

"Debtors") by Rockland Trust Company ("Rockland") and the Second and Fourth

Claims for Relief of the Complaint filed against the Debtors by Donald Lassman, the

Chapter 7 trustee (the "Trustee") of the Debtors and of the jointly administered

affiliated Chapter 7 debtors, Fidar, Inc., Paul's Service, Inc., and Star Fuel, Inc.

(collectively, the "Corporate Debtors").  The Corporate Debtors were previously owned

and operated as gas stations by Mr. Mahfouz.  Through the above referenced counts of

both Complaints, the Trustee and Rockland seek denial of the Debtors' discharge

pursuant to 11 U.S.C. § 727(a)(3) and (5), for failure to keep or preserve financial records

and explain satisfactorily a loss of assets, including over $1 million in private loan

proceeds which Mr. Mahfouz borrowed and claims he invested in his gas station

businesses.

## II.    PROCEDURAL BACKGROUND[1]

The Debtors and Corporate Debtors filed voluntary petitions for relief under

Chapter 7 of the Bankruptcy Code on August 10, 2012 (the "Petition Date"), and they

filed all required Schedules of Assets and Liabilities and Statements on the same date.[2]

On Schedule A – Real Property, the Debtors listed a jointly owned residence at 215

---

[1] The Court may take judicial notice of its docket.  *See* LeBlanc v. Salem (In re Mailman
Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st. Cir. 1999), *cert. denied*, 530 U.S. 1230
(2000)("The bankruptcy court appropriately took judicial notice of its docket[.]").

[2] Star Fuel, Inc. moved to amend Schedule F to add one creditor on September 25, 2014,
but the Court denied the motion due to the failure to file a required amended summary
of schedules.  No amended Schedules have ever been filed by the Debtors.

Judson Street, without reference to a state or town,[3] and a timeshare interest in North

Conway, New Hampshire.  On Schedule B – Personal Property, the Debtors disclosed,

*inter alia*, cash on hand in the amount of $20.00, a savings account at Bristol County

Savings Bank containing $224.31, an account at Northeastern University Credit Union

containing $1,200.00, and a "Rockland Trust CD" valued at $3,929.37.  On Schedule B,

however, the Debtors did not provide any account numbers for any of the accounts.

The Debtors also listed a "Possible legal claim against previous attorney for unfair

dealings."   In response to Question 13 on Schedule B, entitled "Stock and interests in

incorporated and unincorporated businesses," the Debtors replied: "Debtor owned and

operated business as Star Fuel Inc., Paul's Service Inc. and Fidar Inc.  All the businesses

are bankrupt and caused the personal filing."    On Schedule D – Creditors Holding

Secured Claims, the Debtors listed Bank of America as the holder of three mortgages on

their residence.[4]  On Schedule F – Creditors Holding Unsecured Nonpriority Claims,

the Debtors listed $1,673,635.74 in claims, $1,038,500 of which they characterized as

"business loans."  Most of the business loans listed on Schedule F were marked with a

"J" to indicate a joint obligation of both Debtors.  On Schedule I – Current Income of

Individual Debtor(s), the Debtors listed Mr. Mahfouz as unemployed and Mrs.

---

[3] Presumably, this property is in Raynham, Massachusetts, based upon the address set forth in the Debtors' bankruptcy petition.

[4] Evidence introduced by the Trustee at the trial included two Mortgage and Security Agreements executed by Mrs. Mahfouz, on March 29 and August 3, 2010, in which she granted mortgages in the real property located at 215 Judson Street, Raynham, Massachusetts to Rockland to secure her guarantees of the Corporate Debtors' debt to Rockland.  These mortgages were not disclosed on the Debtors' Schedule D.

3

Mahfouz as employed by Northeastern University.[5] The Debtors left the space for information concerning "Dependents of Debtor and Spouse" blank.[6]

With respect to the Debtors' Statement of Financial Affairs ("SOFA"), in response to Question 1, entitled "Income from employment or operation of business," the Debtors reported the following gross income received from 2010 through 2012: (1) $346,455 for 2010 "(debtor businesses generated $145k capital gain, $89k from operation of business), spouse earned $112k from employment;" (2) $105,000 for 2011 "Debtor had a business loss, spouse earned approx. [sic] $105k, taxes not completed;" and (3) $55,061.71 for 2012 "2012 year to date, Debtor has a business loss, spouse earned approx [sic] $55k. Loss not included in the income number."   In other words, Mr. Mahfouz reported receiving gross income for 2010 only and reported losses for 2011 and 2012 from the operation of his businesses.   It does not appear from Schedule I that Mr. Mahfouz had any other source of income.   On SOFA Question 10, entitled "Other transfers," the Debtors replied "None" in response to the following: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case." In response to Question 11 on the SOFA, entitled "Closed financial accounts" concerning financial accounts closed within one year of the commencement of the case, the Debtors disclosed closed

_____

[5] It would appear, based upon the testimony elicited at trial, that Mrs. Mahfouz is "Spouse" for purposes of the Debtors' Schedules and Statements.

[6] Both Mr. and Mrs. Mahfouz testified at the trial that they have four children under the age of eighteen.

bank accounts at Mayflower Bank, Bank of America and Admirals Bank, but did not provide account numbers for the closed accounts.

As noted above, on August 10, 2012, the Corporate Debtors each filed voluntary petitions under Chapter 7 of the Bankruptcy Code.  The SOFAs of the three Corporate Debtors reflect that Mr. Mahfouz was the President and owned 100% of the stock of each corporation. The Debtors and the Corporate Debtors were all represented in their bankruptcy cases by Attorney Joseph W. Gruss ("Attorney Gruss").

Donald Lassman was appointed the Chapter 7 Trustee of the Debtors and the Corporate Debtors.[7]  On October 5, 2012, he filed a motion to jointly administer all four cases pursuant to Fed. R. Bankr. P. 1015, which the Court allowed on October 9, 2012. Also on October 5, 2012, shortly after the Trustee convened the Debtors' first meeting of creditors pursuant to 11 U.S.C. § 341, the Trustee filed an application to employ the accounting firm of Verdolino & Lowey, P.C. ("V&L") to perform accounting services for the Trustee, which the Court granted on October 9, 2012.  The Trustee continued the meeting of creditors several times in the Debtors' case.

In October, 2012, Rockland, who is a creditor of both the Corporate Debtors and the Debtors, who personally guaranteed the Corporate Debtors' obligations to Rockland, filed motions to conduct examinations of Mr. Mahfouz, as the principal and owner of the Corporate Debtors and for production of documents, pursuant to Fed. R.

---

[7] Warren Agin was originally appointed the Chapter 7 trustee of Star Fuel, Inc. He resigned on September 17, 2012, and Mr. Lassman was substituted as Trustee.

Bankr. P. 2004 (the "2004 Motions"), all of which were allowed by the Court.   On November 2, 2012, Rockland filed a Motion to Compel the Corporate Debtors to produce documents, and the Trustee filed a Motion to Dismiss the Chapter 7 cases of the Debtors and the Corporate Debtors for "cause" pursuant to 11 U.S.C. § 707(a).  In his Motion to Dismiss, the Trustee alleged, *inter alia*, that the business affairs of the Corporate Debtors were intermingled with the personal affairs of the Debtors, that all of the debtors failed to provide the Trustee with numerous records he had requested and that, as a result, he was "unable to administer these estates appropriately." Accordingly, the Trustee sought dismissal of the jointly administered cases.   The Debtors filed Responses to both the Motion to Compel and the Motion to Dismiss.  The Court conducted a hearing on both matters on December 10, 2012 and ordered counsel to the Debtors and Corporate Debtors "to forthwith provide the list of cash payments and other records documenting payments that might lead to the pursuit of avoidance power recoveries by the estate." (the "December 10, 2012 Order").  The Court scheduled further hearings with respect to the Motions and ultimately continued them generally. During this time, both Rockland and the Trustee filed several timely motions to extend the deadline within to file complaints objecting to the Debtors' discharge.

The Trustee commenced the instant adversary proceeding on July 17, 2013, by timely filing a four count Complaint against the Debtors seeking denial of their discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4) and (5).  One day later, on  July 18,

2013, Rockland timely filed its Complaint against the Debtors seeking denial of their

discharge pursuant to § 727(a)(3), (4), and (5).[8]

 The Debtors filed their answers to both Complaints on August 20, 2013.  Except

as indicated below, the Debtors, in their answer to the Trustee's Complaint, admitted

the following factual allegations contained in the corresponding numbered paragraphs

of the Trustee's Complaint:

6.  Prior to the Petition Date, Debtor Paul Mahfouz operated Shell gas stations via the three corporate Debtors. Debtor Paul's Service Inc. operated a Shell gas station located in Cranston, Rhode Island. Debtor Star Fuel operated two Shell gas stations with one located in Coventry, Rhode Island and the other in Providence, Rhode Island. And Debtor Fidar, Inc. operated a Shell gas station in Fall River, Massachusetts.

7.  While operating these businesses, Mr. Mahfouz individually, or through one of his corporate entities, borrowed money from various individuals and businesses.

8.  On the bankruptcy schedules filed by Mr. and Mrs. Mahfouz, the Debtors refer to these loans as "Business Loans". The Schedules reflect that there are approximately $2 million in Business Loans.[9]

9.  These Business Loans were largely informal lending arrangements. While a few of these Business Loans are evidenced by a promissory note, Mr. Mahfouz testified that the only complete record of these Business Loans was contained in a notebook. Mr. Mahfouz has testified that in the notebook he recorded the amount borrowed, the borrowing terms and the amount repaid.  **(The Debtors provided in their Answer: "Admit that the loans were largely informal.  Deny as to the notebook.")**

10.  Given the importance of this notebook in understanding the indebtedness and how the Debtors used the proceeds of each loan in their business

---

[8] Rockland's Complaint also contained a count seeking an exception to the Debtors' discharge pursuant to 11 U.S.C. § 523(a)(6).

[9] This amount would appear to be inconsistent with the amount set forth in the Debtors' Schedule F which reflects approximately $1 million in business loans.

and/or individual affairs, the Trustee requested at the initial 341 meeting of creditors that the Debtors produce this notebook.

11.  The Debtors have never produced this notebook. In fact, Mr. and Mrs. Mahfouz have testified that the notebook cannot be located and may have [sic] discarded in the trash.

13.  To further aid in the reconstruction of the Debtors' financial circumstances, the Trustee then requested that the Debtors amend Schedule F for each Debtor (including themselves) to indicate the dates associated with the Business Loans, the amount of the Business Loans and to specify what the proceeds were used for. The Debtors however have never amended these Schedules. **(The Debtors provided in their Answer: "Admit in part, denied in part.  Debtors provided the information directly to the trustee.")**

14.  The Trustee has also requested that the Debtors produce other documents.

     This specifically included:

     (a)  A listing of all payments made within the 90-day period preceding the Petition Date;
     (b)  An identification of all relative/insider loans;
     (c)  All bank statements for the 4-year period prior to the Petition Date; and
     (d)  Recent tax returns for all Debtors.

The Debtors, in their answer to Rockland's Complaint also admitted to numerous factual allegations made by Rockland, including paragraph 44 of its Complaint which provides: "At all times relevant hereto, the Debtors have intermingled the financial records, affairs and transactions of the Corporate Debtors with their own financial records, affairs and transactions."   The factual allegations admitted by the Debtors in their Answers to both Complaints, recited above, were set forth by the Trustee, Rockland and the Debtors in their Joint Pretrial Memorandum, filed on May 19, 2014, under the heading "Facts Which Are Admitted And Require No Proof" and

therefore are deemed admitted for purposes of the trial.  Also, under that heading in the

Joint Pretrial Memorandum, the Debtors admitted that Mr. Mahfouz financed his

business operations, in part, through private loans and that "[t]he private loans were

documented only by a written notebook evidencing loans taken and payments made[,]"

which was "discarded by [Mrs.] Mahfouz by accident."  (the "Notebook").

On September 26, 2013, the Trustee, Rockland and the Debtors filed a Joint

Motion to Consolidate Adversary Proceedings in which they maintained that the

operative facts, law and evidence in both adversary proceedings were substantially

similar. The Court allowed the Joint Motion to Consolidate on October 15, 2013.  At a

status conference conducted on December 16, 2014, the Court ordered that Second and

Fourth Claims for Relief of the Trustee's Complaint, based on 11 U.S.C. § 727(a)(3) and

(5), and Counts I and II of Rockland's Complaint, also based on § 727(a)(3) and (5),

would be consolidated for trial and tried first.  The parties also agreed that for purposes

of economy the Trustee would try the § 727(a)(3) and (5) counts of both Complaints.

The Court conducted a trial on January 13 and 21, 2015 with respect to the above

referenced counts of both Complaints, at which four witnesses, including both of the

Debtors, testified and 20 exhibits were admitted into evidence.  The Debtors introduced

no evidence other than their own testimony and that of Attorney Gruss.  Rockland did

not participate in the trial and stated on the first day of trial that it would rest on the

Trustee's evidence.  At the conclusion of the trial, the Court directed the parties to file

proposed findings of fact and conclusions of law by February 23, 2015, which they did.

Based upon the evidence presented and the entire record of proceedings in the case, the

Court now makes the following findings of fact and conclusions of law pursuant to Fed.

R. Bankr. P. 7052.

## III.    FINDINGS OF FACT

At trial, the Trustee relied primarily on the Debtors' documents and their

testimony as well as that of his accountant, Matthew R. Flynn ("Flynn"), a certified

public accountant at V&L who also is certified in financial forensics.  Flynn testified that

the Trustee had requested bank statements for the Debtors and the Corporate Debtors

for the four year period prior to the Petition Date (the "look-back period").[10]  Flynn

recounted that Attorney Gruss delivered twelve boxes of documents to V&L, over a

period of time, which contained various bank statements, audit workpapers, receipts

and tax records relating to the Corporate Debtors and the Debtors.  He testified: "For

the most part there was no real organization to the boxes." According to Flynn, the

boxes contained folders designated by month with respect to each of the gas stations,

"but everything else was just kind of placed in boxes in a really unorganized fashion."

V&L prepared an inventory of the boxes which was introduced into evidence.  With

respect to bank records, V&L determined that a number of bank statements and

canceled checks were missing.  The firm compared the contents of the boxes with the

Schedules and SOFA filed by the Debtors and the Corporate Debtors and created a

separate inventory of missing statements and canceled checks (the "Missing Statement

Summary").  With respect to the Debtors, that summary reflected missing checks and

---

[10] *See* 11 U.S.C § 548 and Mass. Gen. Laws ch. 109A which permit certain avoidance
actions within two and four years of the commencement of the case, respectively.

bank statements for seven bank accounts for the period between August 1, 2008 and

August 31, 2012. Flynn testified that "[w]e didn't see these bank accounts in the boxes

of documents we had," adding "[t]hese accounts were identified without account

numbers, but they were listed as being bank accounts on the bankruptcy schedules or

Statement of Financial Affairs."

According to Flynn, at some point, supplemental records, including bank

records, were delivered to the Trustee. The Trustee introduced into evidence an

"updated" Missing Statement Summary. He testified that although a majority of bank

statements for certain bank accounts ultimately were provided, there were still missing

checks from those accounts. Additionally, he testified, there were "still a significant

amount of bank records that we never received for [the Debtors] for the four years prior

to the petition date." As reflected in the updated Missing Statement Summary, there

were no statements or canceled checks produced by the Debtors for the period between

August 1, 2008 and August 31, 2012 for their accounts at Northeastern University Credit

Union or Bristol County Savings Bank, which are the two banks listed on the Debtors'

Schedule B. When cross-examined by Debtors' counsel, Flynn acknowledged that the

updated Missing Statement Summary did not take into account the possible

consolidation of accounts resulting from bank mergers or the possibility that some of

the Debtors' accounts, such as brokerage accounts, did not generate monthly

statements. The Debtors, however, introduced no evidence to explain the reasons for

the missing records or evidence of bank consolidations or name changes.

11

Flynn, who has 15 years of experience as an accountant and financial expert, opined that for businesses of the size of the Corporate Debtors and for a household the size of the Debtors, he would have expected to see "bank statements, canceled checks, monthly financial statements, profit and loss, balance sheets for the businesses, . . . , sales information, paid invoices, tax returns, the individual's -- individual tax returns, W-2s, things of that nature."   Flynn testified that after December 2010 through the Petition Date, there were no financial statements for the Corporate Debtors.   With respect to business-related loans in excess of $1 million (the "Business Loans"), Flynn said that he would have expected to see promissory notes, evidence of money being received and deposited, and ledgers showing payments and the accrual of interest. Flynn recalled that he had attended a section 341 meeting and heard Mr. Mahfouz claim that he maintained the Notebook to track loan payments, although he testified that he understood that the Notebook had been discarded in the trash at the Debtors' home.

In an attempt to recreate the Business Loan records, Mr. Mahfouz prepared for the Trustee an undated and unsigned document entitled "Creditors Paid Via Cash" which contains a list of payments he allegedly made to certain creditors. The document has no consistent format or organization, referencing interest rates on one loan and not others and reflecting installment amounts paid, but not the original dates of the loans or the original principal amounts of the loans.   Mr. Mahfouz also delivered two affidavits to the Trustee, dated January 10, 2013 and February 1, 2013 (the "Affidavits").   Both Affidavits provide, in part: "In an attempt to keep my gas station business operational I borrowed money for the business[']" and "I have made the following payments via cash

to my creditors[.]" In the Affidavits, Mr. Mahfouz indicated that he made cash payments to certain named creditors in connection with fifteen loans, some of which were substantial amounts (i.e., $100,000 and $300,000) and that promissory notes were executed with respect to only four of the fifteen loans. As with the "Creditors Paid Via Cash" document, the Affidavits provide incomplete information about the loan repayments. According to Flynn, although these documents explained some of the loan histories, they did not provide the complete picture of when payments were made, the frequency of the payments, interest accrued on the loans, or the date that the last loan payment was supposedly made. The documents did not enable him to fully understand the Business Loans. To Flynn's knowledge, the Debtors never provided the Trustee with a full and comprehensible list of all payments made during the preference period or a listing of insider loans.

V&L prepared a one page summary entitled "Sources and Uses of Cash since 12/31/2007" for the look-back period between January 1, 2008 and the Petition Date for Fidar, Inc., Paul's Service, Inc. and the Debtors (the "Cash Analysis")[11] which details the cash inflows and outflows for all debtors from various sources.[12] Flynn testified that the purpose of the Cash Analysis was to investigate the Debtors' assertion that all borrowed

---

[11] It is unclear why the Cash Analysis omits reference to Star Fuel, Inc. As Flynn's testimony concerning the Cash Analysis did not indicate any exclusion of Star Fuel, Inc., the Court presumes the Cash Analysis encompasses all debtors.

[12] According to Flynn, additional bank statements were provided while the Cash Analysis was being prepared and those supplemental statements were relied upon in the preparation of the analysis.

cash went into the businesses.  With respect to cash inflow, the Cash Analysis provides, *inter alia*, the following:

|  | Personal | Business | Total |
|---|---|---|---|
| **Starting point**: | | | |
| Confirmed Minimum Cash on hand as of 12/31/07 | $  - | $ 51,866.09 | $ 51,866.09 |
| Plus Cash In: | | | |
| EBITDA 2008 through April 2012 | $  - | $406,102.54 | $406,102.54 |
| Bank Loan Proceeds | | $358,000.00 | $358,000.00 |
| Private Loan Proceeds | $  - | $638,200.00 | $638,200.00 |
| Asset Sales Proceeds | $300,000.00 | $125,000.00 | $425,000.00 |
| Spouse Earnings | $293,267.44 | $  - | $293,267.44 |
| **Total** | $593,267.44 | $1,579,168.63 | **$2,172,436.08** |

As reflected in the Cash Analysis, according to Flynn, there was a "Confirmed Minimum Cash on Hand" of the Corporate Debtors as of December 31, 2007 of $51,866.09, based upon V&L's review of bank statements in its possession.  V&L also determined that the EBITDA (earnings before interest, taxes, depreciation and amortization) for 2008 through April, 2012 for the Corporate Debtors was $406,102.54.[13] From the beginning of 2008 through 2010, the Corporate Debtors had positive EBITDA.

---

[13] According to Flynn's testimony and the footnotes accompanying the Cash Analysis, the EBITDA for 2008, 2009 and 2010 was calculated based upon financial statements received from former accountants.  As there were no financial statements available for 2011 or 2012, the EBITDA for those years was calculated by V&L based upon assumptions made concerning sales information available for that time period.

Flynn testified that the Corporate Debtors also took in $358,000 in "Bank Loan Proceeds" documented by two promissory notes with Rockland in the amounts of $58,000 and $300,000. Flynn also determined that during the four year look-back period, there were "Private Loan Proceeds" totaling $638,200, which were "the so-called business loans we were able to trace . . .  – either monies made payable to or monies deposited into the – or checks written out to the debtors during this four-year period . . . . " Although the Debtors' Schedules reflected a number in excess of $1 million, $638,200 was the amount Flynn could "actually trace."   As reflected above, the Debtors recognized $300,000 and the Corporate Debtors recognized $125,000 in "Asset Sales Proceeds" attributable to the sale of real estate in the country of Lebanon and to the sale of Fidar Inc.'s business assets, respectively.  According to the applicable footnote on the Cash Analysis, this amount was based upon buyer affidavits and testimony elicited at a section 341 meeting.  Lastly, the Cash Analysis reflects that the Debtors had "Spouse Earnings" of $293,267.44, which was based on the Debtors' Schedule I, the SOFA for 2010 through 2012 and estimates for 2008 and 2009.

According to Flynn, the total amount of cash-in from January 1, 2008 through the Petition Date, plus documented cash on hand as of December 31, 2007, was $1,579,168.63 for the Corporate Debtors and $593,267.44 for the Debtors (totaling $2,172,436.07).  He testified that the total number was a conservative figure based on the assumptions made in the absence of financial records for a portion of the look-back period.

V&L also analyzed the total amount of cash disbursements during the look-back

period.   Its Cash Analysis provides, *inter alia*, the following:

| Minus Cash Out: | Personal | Business | Total |
|---|---|---|---|
| Loan Repayments via Bank | $    - | ($291,502.24) | ($291,502.24) |
| Loan Repayments via Cash | $    - | ($425,200.00) | ($425,200.00) |
| Personal Living Expenses | ($403,774.56) | $    - | ($403,774.56) |
| Unexplained Use of Cash | ($189,492.88) | ($862,466.39) | **($1,051,959.28)** |
| Equals cash on hand as of filing date August 10, 2012[14] | $    - | $    - | $    - |

The Cash Analysis reflects that there were "Loan Repayments via Bank" of  $291,502.24, made by the Corporate Debtors.  The applicable footnote reflects that this amount consists of verified checks and electronic funds transfers "clearing the bank since December 31, 2007." Flynn testified at trial that "[w]e actually saw checks going to these people." The amount for "Loan Repayments via Cash" made by the Corporate Debtors of $425,200 is, according to Flynn, a conservative number that "was recreated based on the loan repayments that were evidenced in the affidavit of Paul Mahfouz." The applicable footnote on the Cash Analysis reflects that this amount also was determined by reference to "creditor affidavit or witness statement." Flynn testified that the "Personal Living Expenses" of the Debtors of $403,774.56 was calculated based upon an average of the monthly amounts set forth in the Debtors' Schedules.

---

[14] According to Flynn, there was very little or no cash in the bank on the Petition Date.

Thus, according to Flynn, the total cash taken in by the Debtors during the look-back period was $593,267.44 (generated from Asset Sales Proceeds and Spouse Earnings) and the total cash-out for them during that period was $403,774.56 (incurred through Personal Living Expenses), yielding a difference of $189,492.88, reflected as "Unexplained Use of Cash" for the Debtors for the look-back period.   The total cash-in for the Corporate Debtors during the look-back period was $1,579,168.63 (generated from Cash on Hand, EBITDA, Bank and Private Loan Proceeds and Asset Sales Proceeds) and the total cash-out for them during that period was $716,702.24 (incurred through Loan Repayments via Bank and Cash), yielding a difference of $862,466.39, reflected as "Unexplained Use of Cash" for the Corporate Debtors during the look-back period.  Flynn testified that, based on this analysis, there was no indication that the cash Mr. Mahfouz borrowed was reinvested into the businesses as he had maintained at a section 341 meeting.  When asked whether he had any idea where that cash may have gone, Flynn responded: "No, I don't."   As reflected in Flynn's testimony and the footnotes of the Cash Analysis, the Cash Analysis was supported by a number of documents introduced into evidence as well as witness statements and creditor claims.

Attorney Gruss, who represented the Debtors and the Corporate Debtors in their bankruptcy cases, testified as a witness for the Debtors.[15]  Attorney Gruss has practiced bankruptcy law for more than ten years.  He testified that the section 341 meetings conducted by the Trustee of the Debtors and the Corporate Debtors "were all . . . done .

---

[15] No party raised any objection to calling Attorney Gruss as a witness.  Therefore, there is no attorney-client privilege issue with respect to his testimony.

. . at the same time . . . because the individuals and the corporate were so intertwined."

He testified that he asked the Debtors to produce their financial records and a list of creditors prior to the bankruptcy filings. He stated that the Debtors never refused to produce a requested document, and that he never had the impression that the Debtors were not giving him the whole story.   Nonetheless, he testified that there were problems with their records stating: "I remember the creditor list was kind of a disaster. . . ."   He also testified that after an initial section 341 meeting, the Trustee requested additional documents, including "bank records going back several years on the businesses."   Attorney Gruss indicated that he immediately communicated this request to the Debtors, telling them that "we need to get these records.   Bring me all your records."   He said that he communicated frequently with both of the Debtors in an attempt to satisfy the Trustee's various document requests.   He testified that Mr. Mahfouz brought him boxes of documents which had been stored in his home garage, following an eviction from one of the gas stations he operated.   Attorney Gruss then delivered the document boxes to V&L in three separate deliveries.   When asked at trial why he thought the Trustee sought records for the four-year look-back period prior to the Petition Date, Attorney Gruss replied that he did not know, adding that he was not familiar with the Massachusetts Uniform Fraudulent Transfer Act.   With respect to the Affidavits signed by Mr. Mahfouz, Attorney Gruss testified that those were prepared to "recreate" the Notebook as directed by the Court, presumably following the issuance of the December 10, 2012 Order.

The Debtors testified on their own behalf.  Mr. Mahfouz testified that he and his wife have four children under the age of eighteen.  He further testified that he leased his first gas station in 1995, and then owned or leased five or six other gas stations. During his testimony, Mr. Mahfouz repeatedly stated that "I had to borrow money," "I paid" loan creditors, and he made other references to personally borrowing and making payments on the Business Loans.

Mr. Mahfouz said the gas stations did business as Shell gas stations.  At or about 2010, the relationship with Shell ended, although the gas stations still carried the Shell name, and a new supplier, Colbea Enterprises ("Colbea"), became the principal landlord and gasoline supplier for the stations. This change, he testified, resulted in higher rent payments and a different fuel pricing structure.  Mr. Mahfouz testified that Colbea required payment either with bank checks or by automatic debits from bank accounts.  This new arrangement sometimes created a cash shortage for the businesses. Things became difficult in 2010, he testified, when gas prices rose to $5.00 per gallon, and he had to purchase up to $80,000 worth of gasoline for every station.  He stated: "I got to cover that money right away and if I don't they kick me out of the gas station." In addition to the income generated selling sundries at the gas stations, he testified that he personally borrowed money from friends and business associates to "keep the business running."

Mr. Mahfouz testified that he maintained the Notebook to keep track of the cash payments on the Business Loans and recounted the description he gave of the Notebook at one of the section 341 meetings: "[W]hen I pay somebody cash I have a little book for

19

myself like how much I pay. . . . I write like, you know, I pay you that much that day and where, where we met, so you don't tell me you don't get paid."   He did not, he testified, bring the Notebook when filling out his Schedules with Attorney Gruss, nor did he inform him of its existence prior to the section 341 meeting.

Ninety percent of the Business Loans, Mr. Mahfouz maintained, were evidenced by promissory notes which, he said, he gave to his attorney for delivery to the Trustee. Despite this contention, in his Affidavits he indicated that only four of the fifteen loans listed were supported by promissory notes. Mr. Mahfouz appeared to blame this deficiency on his attorney: "Maybe the attorney did not write the promissory note [on the affidavit].   My affidavit is how much I was paying cash for everybody."   The Debtors did not offer any promissory notes, nor any other documents, into evidence and could not adequately explain the discrepancy between Mr. Mahfouz's Affidavits and his testimony.

Mr. Mahfouz testified that the funds he borrowed from private lenders were used to pay business expenses such as overhead, salaries, utilities, and other operating expenses.   According to the Debtors' Schedules, these amounts exceeded $1 million. When asked whether there was "any possibility that any portion of the one million dollars plus that was borrowed in the time period before the bankruptcy case ended up anywhere other than the business?" Mr. Mahhouz replied, "No, sir," and confirmed that "every single dollar that was borrowed from these individual lenders went into the business." He also testified that he did not use any of the loan proceeds to purchase personal assets.

Mr. Mahfouz testified that the demise of the businesses occurred in 2012 when he attempted to buy a previously leased gas station in Providence from Colbea. He was represented in that transaction by an attorney, Michael Sahady ("Attorney Sahady"). Attorney Sahady loaned Mr. Mahfouz approximately $75,000 to make a down payment on the property when he was unable to secure financing from Rockland for the transaction. Although Mr. Mahfouz was unclear as to the details, a dispute arose between Colbea and Attorney Sahady concerning the acquisition. As a result, Mr. Mahfouz testified, Colbea refused to close the sale, retained the $75,000 deposit,[16] and informed him that it would no longer do business with him. According to Mr. Mahfouz, the gas stations closed in the summer of 2012.

With respect to the Trustee's document requests, Mr. Mahfouz repeatedly emphasized that he produced all records that he had. He said that he frequently called Attorney Gruss asking "Do I have to do anything?" Mr. Mahfouz continued: "And he keeps saying to me, 'No, no.' And well, sometimes he say, yeah, bring something. I bring it. Whatever he ask, I'm there the next day." He steadfastly maintained that he gave Attorney Gruss everything he asked for and that Attorney Gruss advised him that he had provided the Trustee with all records requested. When asked at trial whether he was aware of the Trustee's Motion to Dismiss the Chapter 7 case, Mr. Mahfouz replied: "I provide all the records you guys asked me for. I did provide you all the records I

---

[16] The Trustee recovered a portion of the deposit through a stipulation with Colbea approved by the Court during the Debtors' bankruptcy case. Mr. Mahfouz testified that he gave the Trustee documents to assist him in this regard.

have in my possessions." Following a further section 341 meeting in 2013 at which the
Trustee asked for missing bank statements, Mr. Mahfouz testified that he went to "all
those banks" to request copies of the statements and that he did procure some.   It is
unclear from his testimony whether he visited Northeastern University Credit Union
and/or the Bristol County Savings Bank.   When asked at trial why there were no
income statements available for the Corporate Debtors after 2010, Mr. Mahfouz replied:
"You have to ask my CPA. I don't know how to answer that question. My CPA does my
work for the gas station. I don't know." The Debtors did not call the accountant as a
witness at trial.

      With respect to the sale of the property in Lebanon reflected on V&L's Cash
Analysis, Mr. Mahfouz testified that he had been the owner of a parcel of vacant land in
Lebanon and an adjacent house which he had inherited from his father.   The Trustee
introduced an "Acknowledgement" executed by Rima Abdallah Herro ("Herro"), dated
July 24, 2013, who acknowledged that on February 11, 2011, Herro bought "Division IV
of the Plot No: 1117/Halat Praedial Region, from Mr. Zakhia Fayez Mahfouz, as Proxy
of Mr. Paul Fayez Mahfouz at a price of [$170,000]."   Herro apparently purchased the
house.   The Trustee also introduced an "Acknowledgement" from another buyer of
property, presumably the vacant land in Lebanon, who acknowledged a purchase from
Mr. Mahfouz in April, 2010 for the amount of $125,000.[17]   Notwithstanding the sales

---

[17] The Acknowledgements were procured for the Trustee by Mr. Mahfouz from a
registry of deeds in Lebanon with help from his brother.

price reflected on the vacant land Acknowledgement, Mr. Mahfouz recalled a different amount: "I think the house was like [$]170 and the property maybe [$]200, [$]225.  I don't recall like exact amount." When questioned about the price he received for the vacant land transfer reflected in the Acknowledgement ($125,000), Mr. Mahfouz testified: "I got paid more money but he register it less money so he doesn't pay the taxes on the property."

Mr. Mahfouz testified that he received some of the sale proceeds for the house and the vacant land in cash and some by wire transfer to his bank account, although he could not recall which account the funds were wired to or how much he actually received.  He offered no documentary evidence to support a wire transfer or a bank deposit.  He added that he used whatever funds he received from these sales to "keep the business running." Mr. Mahfouz also testified that there was an outstanding "loan" on the Lebanon house in the amount of $160,000, but again offered no documentary evidence to support the existence or payoff of any mortgage.  It is unclear what proceeds Mr. Mahfouz actually received from either sale.

Mr. Mahfouz testified about the preparation and filing of his bankruptcy Schedules and was asked whether he recalled signing the petition: "Can I tell you honestly the truth?  When the lawyer told me sign here, I sign here.  I don't know. I don't read every details."  With respect to the Lebanon real estate transfers, he said he first became aware of his obligation to report the transfers at one of the section 341 meetings. When asked why he did not disclose the Lebanon property transfer on the SOFA, he said that the omission was not his fault.  He said he told his attorney about

23

the sale but did not disclose it on the SOFA because Attorney Gruss said he only had to disclose transfers "one year" prior to the bankruptcy.

Mrs. Mahfouz, a university professor who holds a Doctor of Pharmacy degree, also testified in defense of the Trustee's Complaint.  She considered her financial affairs and records to be separate from those of her husband as she was a salaried employee.  She testified that she did not involve herself in the gas station businesses and played no role in their operations: "I mean, he was on the business side and I drove to [work in] Boston every day."  With respect to her guaranty of the Corporate Debtors' obligations to Rockland, which were secured by mortgages on the family's home, she testified that she did not know the interest rate or the balance due on those debts.   She testified that she largely was unaware of the problems with the businesses until July, 2012, and that those problems were the cause of the Debtors' personal bankruptcy filing.  When she became aware of these financial problems at that time, she researched potential claims and filed a complaint against Attorney Sahady with the Board of Bar Overseers ("BBO").  She also suggested to Mr. Mahfouz that the couple file bankruptcy to get a fresh start, but she did not consider separate legal representation.   Prior to the filing of the Debtors' Schedules, she did "go through them to kind of check information, but largely it was nothing – not my information."

Following the first section 341 meeting, Mrs. Mahfouz testified,  she understood that the Trustee needed additional documents, and she described the Debtors' efforts to comply: "[I]f it was related to Paul, then Paul managed that aspect and if it was something to do with . . . my work, then I was the sole responsible party for that." She

maintained that she wanted to comply with the Trustee's requests and that she and Mr.

Mahfouz were in contact with Attorney Gruss to respond to them.  When asked if there

was any document that was requested that was not delivered to Attorney Gruss, she

replied: "None."

With respect to the Notebook, Mrs. Mahfouz testified that she may have thrown

it out, although she had no specific recollection of doing so.  She testified that Mr.

Mahfouz often put his "stuff" in the children's homework area when he came home

from work and that she may have inadvertently discarded the Notebook with her

children's school papers when cleaning up at the end of the academic year.  When

asked if she knew Mr. Mahfouz maintained a notebook for business records, she could

not confirm that, and she further testified that she first learned about the Notebook at a

section 341 meeting.  With respect to the bank account statements Flynn reported as

missing, Mrs. Mahfouz testified that she either did not recognize those accounts or they

did not generate monthly statements.

## IV.    APPLICABLE LAW

A.    11 U.S.C. § 727(a)(3)

Section 727(a)(3) provides that the court shall grant the debtor a discharge, unless

"the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve

any recorded information, including books, documents, records, and papers, from

which the debtor's financial condition or business transactions might be ascertained,

unless such act or failure to act was justified under all of the circumstances of the

case[.]" 11 U.S.C. § 727(a)(3). In the Second Claim for Relief of the Trustee's Complaint,

the Trustee alleges that the Debtors concealed, destroyed, or failed to keep or preserve

records.   In his post-trial request for findings of fact and conclusions of law, however,

he limits his reliance to the Debtors' unjustifiable failure "to keep or preserve" financial

information from which the Debtors' financial condition or business transactions might

be ascertained.

Section 727(a)(3) involves a shift in the burden of proof. "The initial burden is on

the party objecting to discharge to prove two things: (i) that the debtor 'concealed,

destroyed, mutilated, falsified, or failed to keep or preserve any recorded information;'

and (ii) that the recorded information was information 'from which the debtor's

financial condition or business transactions might be ascertained.'" Lassman v. Keefe

(In re Keefe), 380 B.R. 116, 120 (Bankr. D. Mass. 2007).  Once the objecting party has met

its initial burden, the burden then shifts to the debtor to establish either that the debtor

maintained adequate books and records from which his financial condition can be

ascertained or that the failure to keep adequate books and records can be justified under

the circumstances. Cohen Steel Supply, Inc. v. Fagnant (In re Fagnant), No. 03-10496-

JMD, 2005 WL 1244866, at *3 (Bankr. D.N.H. Apr. 14, 2005)(citations omitted), aff'd, 337

B.R. 729 (B.A.P. 1st Cir. 2006).  Intent to conceal a debtor's financial condition is not a

necessary element to support an objection to discharge for failure to keep books and

records. Thaler v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr.E.D.N.Y.1996).

The Bankruptcy Appellate Panel for the First Circuit recently addressed the

purpose and requirements of § 727(a)(3) in Harrington v. Simmons (In re Simmons), 525

B.R. 543 (B.A.P. 1st Cir. 2015).  It stated:

"The purpose of § 727(a)(3) is to give creditors, the trustee and the bankruptcy court complete and accurate information concerning the debtor's affairs and to ensure that dependable information is provided so that the debtor's financial history may be traced." <u>Canha v. Gubellini (In re Gubellini)</u>, No. 09–016, 2009 WL 8466789, at *4 (1st Cir. B.A.P. Nov. 23, 2009)(footnote omitted)(citing <u>Meridian Bank v. Alten</u>, 958 F.2d 1226, 1230 (3d Cir.1992)). The standard for disclosure of records for purposes of § 727(a)(3) is one of "reasonableness in the particular circumstances." <u>Razzaboni v. Schifano (In re Schifano)</u>, 378 F.3d 60, 68 (1st Cir.2004)(internal quotations and citations omitted). "[A]n impeccable system of bookkeeping" is not required; however, "the records must sufficiently identify the transactions [so] that intelligent inquiry can be made of them." <u>Id.</u> at 69 (internal quotations and citations omitted). The inquiry into the reasonableness of records may include several relevant factors such as "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor or his business; and any other circumstances that should be considered in the interest of justice." <u>Id</u>. at 70 n.3 (internal quotations and citations omitted).

<u>In re Simmons</u>, 525 B.R at 547.

B.     <u>11 U.S.C. § 727(a)(5)</u>

Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" 11 U.S.C. § 727(a)(5). Section 727(a)(5) also involves a shift in the burden of proof.  As explained by the panel in <u>Aoki v. Atto Corp.</u> <u>(In re Aoki)</u>, 323 B.R. 803 (B.A.P. 1st Cir. 2005), there are two stages of proof with respect to this section:

The plaintiff has the initial burden of producing some evidence that the debtor no longer has assets which he previously owned. <i>See</i> <u>Ehle v. Brien</u> <u>(In re Brien)</u>, 208 B.R. 255, 258 (1st Cir. BAP 1997). Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory explanation for the loss or deficiency of the asset. <u>Krohn v.</u> <u>Cromer (In re Cromer)</u>, 214 B.R. 86, 95 (Bankr. E.D. N.Y.1997). . . . What

> constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to
> the discretion of the court. *See* <u>Baum v. Earl Millikin, Inc</u>., 359 F.2d 811, 814
> (7th Cir.1966) . . . . A debtor's explanation need not be comprehensive, but
> it must meet two criteria: First, it must be supported by at least some
> corroboration. *See, e.g.,* <u>Wortman v. Ridley (In re Ridley)</u>, 115 B.R. 731, 737
> (Bankr. D. Mass.1990) (undocumented explanations are not satisfactory
> for § 727(a)(5) purposes) (citing <u>Chalik v. Moorefield (In re Chalik</u>), 748
> F.2d 616 (11th Cir.1984); <u>First Tex. Sav. Ass'n v. Reed (In re Reed</u>), 700 F.2d
> 986 (5th Cir.1983)). Second, the corroboration must be sufficient to
> eliminate the need for any speculation as to what happened to all of the
> assets. <u>Id</u>. A debtor's explanation must consist of more than "a vague or
> indefinite references, evidence or explanations, or an uncorroborated
> hodgepodge of financial transactions." <u>Id</u>. (citations omitted). "A jumble
> of vague, unassorted memoranda, checks, bank statements, and bills" is
> insufficient. <u>Id</u>. at 738 (citing <u>Jackson v. Menick</u>, 271 F.2d 806, 809 (9th
> Cir.1959)). Therefore, discharge will be denied when a debtor makes only
> a vague evidentiary showing that the missing assets involved have been
> used to pay unspecified creditors, or where the debtor fails to provide
> corroborative documentary evidence to confirm his explanation. <u>Id</u>. at
> 737–38 (citations omitted).

<u>Aoki</u>, 323 B.R. at 817-18.

Exceptions to discharge under § 727 require proof by a preponderance of the

evidence. <u>Barclays/American Bus. Credit, Inc. v. Adams (In re Adams</u>), 31 F.3d 389, 394

(6th Cir.1994), *cert. denied*, 513 U.S. 1111 (1995)(applying the rationale in <u>Grogan v.

Garner</u>, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

## V.    POSITIONS OF THE PARTIES

A.    <u>The Trustee</u>[18]

With respect to his claim against the Debtors pursuant to § 727(a)(3) set forth in

the Second Claim for Relief in his Complaint, the Trustee asserts that the Debtors'

---

[18] Although the Trustee and Rockland submitted "Joint" Proposed Findings of Fact and
Conclusions of Law following the trial, the Court shall only reference to the Trustee's
position.

production of records was incomplete, inadequate and did not constitute "dependable

information" on which he could "rely in tracing the Debtors' financial history," citing

Grossman v. Garabedian (In re Garabedian), 520 B.R. 326 (Bankr. D. Mass. 2014).  He

maintains that their inability to keep or preserve adequate records was not justified

under the circumstances of this case.  Given the absence of financial statements for the

Corporate Debtors for 2011 and 2012 and the failure of the Debtors to produce the vast

majority of their personal bank records, the Trustee asserts that he was unable to

account for approximately $1 million that was allegedly lost through the operations of

the Corporate Debtors.  Based on the lack of records and the admitted intermingling of

the Debtors' and Corporate Debtors' financial affairs, the Trustee maintains that it is

impossible to determine whether monies were in fact lost through operations of the gas

stations, used for the Debtors' personal expenses, or secreted away in some unknown

fashion.  The Debtors, he maintains, failed to explain the missing personal bank

statements at trial and the records they did provide were the type of "morass of

records" that are insufficient to ascertain the financial condition of a debtor, citing

Krohn v. Frommann (In re Frommann), 153 B.R. 113 (Bankr. E.D. N.Y. 1993).  He asserts

that Mr. Mahfouz's affidavits, which amount to no more than unsubstantiated

testimony, are not an acceptable substitute for the missing Notebook and do not satisfy

§ 727(a)(3) because creditors are entitled to *written* documentation of the Debtors'

transactions.

With respect to his claim against the Debtors under § 727(a)(5), the Trustee

asserts that the Debtors' discharge should be denied for their failure to explain

satisfactorily their loss or deficiency of assets to meet their liabilities.   The Trustee

asserts that V&L's Cash Analysis and the testimony of Flynn establish an unexplained

loss of approximately $1 million.   He argues that the Debtors, who offered only

uncorroborated testimony at trial, did not meet their burden of satisfactorily explaining

the missing assets, relying on <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803 (B.A.P. 1st

Cir. 2005) and <u>Harrington v. Simmons (In re Simmons)</u>, 513 B.R. 161 (Bankr. D. Mass.

2014), *aff'd* 525 B.R. 543 (B.A.P. 1st Cir. 2015). He maintains that the documents supplied

to him do not corroborate Mr. Mahfouz's vague and superficial testimony that "every

dollar he borrowed went into running his business" and that Mrs. Mahfouz's testimony

was inadequate such that the Debtors did not meet their burden.   The Debtors'

testimony, he argues, was far too vague to rebut the Trustee's evidence and did not

eliminate speculation as to what happened to the Debtors' assets.

     B.    <u>The Debtors</u>

With respect to the Trustee's claim under § 727(a)(3), the Debtors maintain that

Mr. Mahfouz produced adequate records of his business dealings when he "recreated"

the missing Notebook's entries through the Affidavits and the "Creditors Paid Via

Cash" summary.   The delivery of these documents to the Trustee, the Debtors maintain,

was "well within applicable limitations periods to pursue any party who allegedly

received a voidable transfer." In support of their position, they point to the Trustee's

successful recovery of a portion of the $75,000 Colbea deposit as evidence of their

cooperation.   The Debtors' failure to produce the Notebook, they argue, is insufficient to

justify denial of their discharge under § 727(a)(3) "in light of the clear and convincing

evidence that the notebook was not needed by the Trustee to ascertain the Debtors'

financial condition or transactions."   With respect to missing bank statements, the

Debtors appear to assert that the Trustee mistakenly classified credit card accounts, CD

and brokerage accounts, and mortgage loans as missing bank statements when monthly

statements for those accounts did not exist.   They also attribute missing statements to

consolidation of accounts by virtue of bank mergers.

With respect to the Trustee's cause of action under § 727(a)(5), the Debtors

maintain that Mrs. Mahfouz was unaware of the business related debts of her husband

until just prior to the bankruptcy filing and that she had virtually no involvement in his

business affairs. The Debtors contend that the Trustee has not established that they have

failed to satisfactorily explain loss of assets as they were in touch with their counsel on a

near daily basis and that Mr. Mahfouz "produced thousands of pages of bank

statements[,] promissory notes, Lebanon land transfer documents . . , all of his profit

and loss statements, multiple affidavits and sworn documents, and all available

business records" to satisfy the Trustee's document requests.   The Debtors also make

passing reference that following the termination of the Colbea relationship and the

eviction from the gas stations, there were business assets Mr. Mahfouz could not take

with him.

## VI.   DISCUSSION

As a preliminary matter, the Court is compelled to note that the Debtors'

personal records were incomplete, intermingled with those of the Corporate Debtors,

disorganized and, in some cases, misleading.   Mr. Mahfouz testified numerous times at

trial that *he* was the borrower of the Business Loans and that *he* made the cash repayments to those creditors.  It was impossible for the Trustee to determine the ultimate disposition of the Business Loans proceeds, i.e., whether they were retained by the Debtors or whether Mr. Mahfouz invested them in the businesses, based solely upon the Debtors' incomplete personal records.  The Trustee, by necessity, had to delve into the records of the Corporate Debtors to substantiate Mr. Mahfouz's claim that he had invested all loan proceeds in the businesses and to determine the Debtors' financial condition in general.  Indeed, he presented substantial evidence at trial regarding the Corporate Debtors' records, operations, income and expenses to investigate the position advanced by Mr. Mahfouz.

While the operations of the gas stations were conducted through the Corporate Debtors, which are distinct legal entities from the Debtors, the Court's consideration of the adequacy of the Corporate Debtors' records is appropriate and necessary here to determine the Debtors' personal financial condition and business transactions.  Failure to keep adequate corporate records has been found by some courts to be a valid consideration for denial of an individual's discharge under § 727(a)(3), where a debtor, such as here, was the sole owner of and conducted business through a closely held corporation.[19]  *See*  <u>Wachovia Bank, N.A. v. Spitko (In re Spitko</u>), 357 B.R. 272, 308

---

[19] The Trustee and Rockland did not plead a count for denial of Mr. Mahfouz's discharge pursuant to 11 U.S.C. § 727(a)(7) which provides that a debtor's discharge will be denied where he "has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." 11 U.S.C. § 727(a)(7); s*ee generally* <u>Watman v.</u>

(Bankr. E.D. Pa. 2006)(court concluded that the financial records of closely held entities were needed for the trustee and creditors to have accurate information concerning the debtors' assets that might be available for liquidation); Sterling Int'l, Inc. v. Thomas (In re Thomas ), No. 01–6321, 2003 WL 21981707, at *11 (Bankr. D. Idaho July 17, 2003) ("[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."); Phillips v. Nipper (In re Nipper), 186 B.R. 284, 289 (Bankr.M.D.Fla.1995)("A debtor's discharge cannot be denied where production of corporate financial records is inadequate because the corporation is a separate entity[;]" however, denying the debtor's discharge under § 727(a)(3) because debtor, as the sole officer and shareholder of a corporation, failed to keep or preserve records from which his business transactions might be ascertained.). *See also* Lawrence P. King, 6 Collier on Bankruptcy ¶ 727.03[3][e](16 ed. rev. 2010)("All books and records that are material to a proper understanding of the debtor's financial condition and that are not merely personal books or records are within the scope of [§ 727(a)(3)]"). Accordingly, the Court's consideration of the adequacy of the Corporate Debtors' records under the facts of this case is warranted for purposes of § 727(a)(3), although the Trustee did not advance an alter ego or veil piercing theory.

---

Groman (In re Watman), 458 F.3d 26, 31, n.3 (1st Cir. 2006).  As Mr. Mahfouz is the President of each of the Corporate Debtors, he is an "insider" of each. *See* 11 U.S.C. § 101(31)(A)(iv).

Similarly, with respect to the Trustee's claim under § 727(a)(5), the Court's consideration of the Corporate Debtors' loss of cash is also necessary to assess the Debtors' explanation for the missing Business Loan proceeds, i.e., whether those proceeds went "into the business."

A.  Section 727(a)(3)

The Court finds that the Trustee has met his burden of establishing by a preponderance of the evidence that Mr. Mahfouz failed to keep and/or preserve records of the Corporate Debtors from which the Debtors' personal financial affairs or business transactions could be ascertained. The Corporate Debtors operated four gas stations which generated more than $400,000 in EBITDA from 2008 through 2012.  Their operations were financed through bank and private loans, and their revenues were dependent on the fluctuating price of gasoline which had a significant impact on cash-flow.  As such, the business operations of the Corporate Debtors were complex.  Flynn's expert testimony, which was not satisfactorily rebutted, was that he would typically see "bank statements, canceled checks, monthly financial statements, profit and loss, balance sheets" for a businesses of the size of the Corporate Debtors.  Yet, the Debtors produced insufficient records to explain the disposition of the Business Loan proceeds. They provided no financial statements for the businesses for 2011 or 2012.  When asked to explain that failure on cross-examination, Mr. Mahfouz responded: "ask my CPA," even though the Debtors did not call him, or any other expert, to testify.  The updated Missing Statement Summary reflects missing bank statements and canceled checks for a number of years for the Corporate Debtors with respect to several bank accounts,

34

despite the Debtors' efforts to supplement those records.  Further, the Debtors did not

introduce into evidence any documents to support Mr. Mahfouz's testimony that "90%"

of the Business Loans were evidenced by promissory notes, or that he had, in fact,

delivered them to the Trustee.

The Debtors also did not produce receipts or ledgers of payments with respect to

the Business Loans according to Flynn.  The only contemporaneous record of the cash

payments made on these loans was allegedly contained in the missing Notebook.  Even

assuming the existence of the Notebook, the Court concludes that it would not have

been an adequate source from which the Trustee could have ascertained the full

financial terms of the Business Loans given Mr. Mahfouz's vague description of its

contents and his apparent belief that it was not important enough to use while

preparing his Schedules or to disclose to his attorney prior to the section 341 meeting.

For all of these reasons, the Court finds that Mr. Mahfouz failed to keep and/or

preserve the Corporate Debtors' books and records from which the disposition of the

Business Loan proceeds or the Debtors' financial condition or business transactions in

general could be ascertained.

The Court finds that the Trustee has also met his burden of establishing by a

preponderance of the evidence that the Debtors failed to keep and/or preserve personal

books and records from which their financial affairs or business transactions could be

ascertained.  First, the Debtors' Schedules and SOFA, the starting point from which a

trustee must begin an analysis to administer an estate, were incomplete and misleading.

Neither of the Debtors, according to their own testimony, carefully or completely

reviewed the petition, Schedules or SOFA prior to signing them.   Schedule B did not

provide the account numbers for their personal bank accounts and Schedule J did not

provide information about their dependents, despite the fact that they had four minor

children.  The Debtors did not schedule the secured claims of Rockland on Schedule D,

and they answered "None" on SOFA Question 10 regarding property transfers outside

the ordinary course of business within two years of the petition date, despite the 2011

Lebanon house sale to Herro.

Second, the Debtors' attempts to supplement the information provided in their

Schedules and SOFA resulted in a document production that was piecemeal,

disorganized and incomplete.  This required the Trustee to expend time and money to

file the Motion to Dismiss and necessitated the Court's issuance of the December 10,

2012 Order. Despite the Debtors' efforts to supplement their document production,

Flynn credibly testified that they never provided the Trustee with a list of insider loans

or payments made within the preference period.   The Court finds Mr. Mahfouz's

repeated assertion that the Debtors gave the Trustee "everything" to be a generalization

lacking in credibility given Mr. Mahfouz's faulty memory and vague description of

various transactions.  Although Mrs. Mahfouz testified that she gave her attorney all

documents requested, that assertion is belied by the evidence adduced at trial and the

Trustee's numerous requests to get additional information.   Crucially, the updated

Missing Statement Summary reflects that the Debtors still failed to produce bank

statements for the personal accounts listed on their Schedule B for the entire look-back

period, including an account from Northeastern University Credit Union, the credit

union of Mrs. Mahfouz's employer.  The lack of bank records is especially troubling because bank statements or canceled checks for these accounts could have been obtained and could have accounted for the disposition of some or all of the Business Loans proceeds.  Lastly, the Lebanon sale Acknowledgement for the vacant land transfer contains sales figures which Mr. Mahfouz testified were inaccurate, and he did not produce documentary evidence to support deposits of the sale proceeds or the satisfaction of any mortgages encumbering the Lebanon house.  The overwhelming evidence produced at trial demonstrates that the Debtors failed to provide the Trustee with all documents he requested, and what they did provide to him was inadequate to determine their financial condition or business transactions.

The Debtors' attempt to characterize their records as adequate fails in light of the evidentiary record.  First, the "Creditors Paid Via Cash" summary and the Affidavits produced by Mr. Mahfouz are not an adequate record of the Business Loans.  While it is impossible to know whether these documents accurately "recreated" the entries in the missing Notebook, as asserted by the Debtors, the relevant question is whether they provide a full accounting of the Business Loans. The Court finds that they do not.  The "Creditors Paid Via Cash" summary is unsigned, undated and has an inconsistent format.  As testified by Flynn, the Affidavits provide varied and incomplete information about loan repayments, omitting a full schedule of when loans were obtained, when repayments were made, the amount of accrued interest or the exact dates of the last payments.   Moreover, the veracity of the Affidavits is questionable as they reflect that only four of the fifteen loans were supported by promissory notes while Mr. Mahfouz

37

testified that "90%" of the loans were evidenced by promissory notes.   Flynn convincingly testified that these documents did not enable him to fully understand the indebtedness that stemmed from the Business Loans.   Although the Trustee was able to recover a portion of the Colbea deposit, that alone does not support the Debtors' contention that the documents supplied to the Trustee were sufficient "to pursue any party who allegedly received a voidable transfer."

Second, the Lebanon land transaction Acknowledgements provided by the Debtors were questionable in their accuracy and unsubstantiated by evidence of bank deposits or any other proof concerning the disposition of the sale proceeds.   Mr. Mahfouz's account of the transactions was hazy at best, and the Acknowledgements did not clarify an already murky picture with respect to the Lebanon transfers.   Third, despite the Debtors' retrieval of bank statements directly from some of their banks, the updated Missing Statement Summary prepared by V&L still reflects that a substantial number of account statements were not produced by the Debtors, including accounts at the banks listed on their Schedule B.   The Debtors' efforts to explain the absence of records through the possibility of bank mergers or otherwise was not supported by evidence.

The Debtors' testimony establishes that they were in frequent contact with their attorney and each endeavored to give him some documents.   It is unclear whether the Debtors were, at best, simply poor record keepers who failed to fully grasp their disclosure duties as bankruptcy debtors under 11 U.S.C. § 521(a)(3) and (4), or were, at worst, actively engaged in concealment of their financial condition.   Intent to conceal,

however, is not a necessary element to support an objection to discharge under §

727(a)(3).  Thaler v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr.E.D.N.Y.1996). The

Debtors' efforts to deliver supplemental documents to the Trustee, while reflecting

some effort to comply with their obligations, does not compensate for their obvious

failure to keep or preserve contemporaneous and meaningful records.  Moreover, the

record does not reflect that the Debtors sought to obtain sufficient corroborating records

from third parties to satisfy the Trustee's repeated document requests.  While they did

provide voluminous records to the Trustee, the evidence presented at trial compels the

conclusion that those records were disorganized, confusing and incomplete and did not

constitute the type of "dependable information" from which the Trustee could trace

their financial history.  Canha v. Gubellini (In re Gubellini), No. 09–016, 2009 WL

8466789, at *4 (B.A.P. 1st Cir. Nov. 23, 2009)(footnote omitted)(citing Meridian Bank v.

Alten, 958 F.2d 1226, 1230 (3d Cir.1992)).  Rather, it was the type of voluminous, yet

inadequate, disclosure routinely denounced by courts. See Commonwealth of Mass. v.

Sohmer (In re Sohmer), 434 B.R. 234, 257-58 (Bankr. D. Mass. 2010)("While the absence

of records can conceal the Debtor's financial condition, a surfeit of disorganized,

unreconciled, and commingled accounts can have the same effect."); Krohn v.

Frommann (In re Fommann), 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993)(carton of records

produced by the debtor consisting of bills, checks, bank statements and closing

statements was not sufficient to enable the Trustee to ascertain her financial condition).

The Debtors' failure to keep and/or preserve meaningful records was not

justified or reasonable under all of the circumstances of this case.  Mr. Mahfouz was a

sophisticated businessman, who managed the complex operations of the Corporate Debtors.  He had over fifteen years of experience in running numerous gas stations, and he managed large amounts of debt from both private and institutional lenders in connection with their operations.  Mrs. Mahfouz, although not involved in the daily workings of the businesses, has an advanced degree and played a significant role in the Debtors' financial affairs, such as executing the Rockland guarantees and mortgages, filing a BBO complaint against Attorney Sahady and suggesting that the couple file bankruptcy.  Although she attempted to distance herself from her husband's business dealings, she cannot overcome the fact that she scheduled many of the Business Loans as joint obligations with her husband, and she permitted the intermingling of the financial records and affairs of the Corporate Debtors with their personal records and affairs.  Most importantly, she unjustifiably failed to produce bank statements from the credit union at Northeastern University where she worked.  The Court can reasonably infer from her testimony that she would have been the responsible party for producing those records given her place of employment, and her failure to do so was not adequately explained. "While bank statements and credit card receipts or monthly statements may be simple records, they 'form the core' of what [is necessary] to ascertain [the debtor's] financial condition, primarily his use of cash assets. . . ." The Cadle Co. v. Terrell, 4:01-CV-0399-E, 2002 WL 22075, at *5 (N.D. Tex. Jan. 7, 2002), aff'd, In re Terrell, 46 Fed. Appx. 731 (5th Cir. 2002).

To the extent the Debtors seek to blame their deficient disclosure and record production on their attorney, that defense fails.  Attorney Gruss testified that he told the

Debtors to "bring me all your records[,]" and the Debtors did not establish that he failed to give the Trustee any documents the Debtors delivered to him.  While Attorney Gruss did not demonstrate complete knowledge of bankruptcy law at trial, the Debtors did not establish that their failure to produce adequate records was attributable to any acts or omissions on his part.  Moreover, the deficiencies on the Debtors' Schedules and SOFA should have been obvious to the Debtors had they adequately reviewed them prior to signing.  *See generally* <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106, 111 (1st Cir. 1987).  In a case involving a false oath or account under § 727(a)(4)(A), "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so-and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack. . . . [I]t is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules." <u>Id</u>.

The Debtors failed to adequately document their personal and business income, expenses, assets and transfers in a manner sufficient to enable the Trustee to ascertain their financial condition or business transactions.  Specifically, they failed to document the disposition of the Business Loan cash proceeds and the Lebanon real estate sale proceeds.  As a result, the Trustee was unable to account for the approximately $1 million allegedly lost through the businesses.  Moreover, they failed to provide the Trustee with a complete set of bank records as well as listings of preference period transfers and insider loans to enable him to determine whether the Debtors made

41

preferential or fraudulent transfers which would be voidable and recoverable for the benefit of the estate. *See* 11 U.S.C. §§ 544, 547, 548, and 550; *see also* <u>Grossman v. Garabedian (In re Garabedian)</u>, 520 B.R. 326, 339 (Bankr. D. Mass. 2014). For all of the above stated reasons, the Court shall enter a judgment in favor of the Trustee and against the Debtors on the Second Claim for Relief of his Complaint.

B.      <u>Section 727(a)(5)</u>

The Court finds that the Trustee has met his burden of establishing, by a preponderance of the evidence, that the Debtors no longer have assets they previously did. The Trustee established, through Mr. Mahfouz's testimony and the Affidavits, that Mr. Mahfouz personally borrowed over $1 million in connection with the Business Loans which has not, according to the Debtors' Schedules, been paid back to the private lenders. Through the Cash Analysis, which was amply supported by reasonable financial assumptions, documentary corroboration as well as the credible and largely unrebutted expert testimony of Flynn, the Trustee established the loss of over $1 million in Business Loan proceeds. The Debtors, whose Schedules reflected less than $6,000 in cash, bank account and CD balances on the Petition Date, offered no evidence to satisfactorily explain the location or disposition of that cash other than the unsubstantiated and incomplete testimony of Mr. Mahfouz that all borrowed money went "into the business." Mr. Mahfouz's vague and generalized explanation is not satisfactory as it was unsupported at trial by any corroborative documentary evidence, let alone corroboration sufficient to eliminate the need for speculation as to what happened to the assets. *See* <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803, 817 (B.A.P. 1st

Cir. 2005)(corroboration must be sufficient to eliminate the need for speculation as to what happened to all of the assets).

The Debtors' contention that Mr. Mahfouz produced "thousands of pages" of records, affidavits and sworn statements to explain the loss of assets is unconvincing. V&L attempted to investigate Mr. Mahfouz's contention that all money borrowed had been invested in the businesses. Notwithstanding V&L's receipt and review of the "Creditors Paid Via Cash" summary, the Affidavits and all other documents delivered by the Debtors, Flynn testified that he was still unable to determine where the cash had gone, as is reflected in the unexplained use of cash entries for both the Debtors and the Corporate Debtors in the Cash Analysis.   A "jumble of vague, unassorted [sic] memoranda, checks, bank statements, and bills" is insufficient to establish a defense to a claim under § 727(a)(5). Wortman v. Ridley (In re Ridley), 115 B.R. 731, 738 (Bankr. D. Mass. 1990)(citing Jackson v. Menick, 271 F.2d 806, 809 (9th Cir.1959)).   To the extent the Debtors attribute the loss of assets on the sudden eviction from the gas stations by Colbea in 2012, they failed to support that defense with evidence at trial.

Moreover, the Trustee also established the loss of another asset, the proceeds from the Lebanon real estate transfers. The Debtors failed to provide a satisfactory explanation for the loss of that asset.   Mr. Mahfouz's recollection of the transaction was vague as he could not recall the bank into which wire transferred funds were deposited, and he did not produce documentation concerning any disposition of the sale proceeds or the payoff of any mortgages.   As with the Business Loan proceeds, he testified that the Lebanon sale proceeds went "into the business" but failed to substantiate this. Mrs.

Mahfouz offered no testimony on this point.  As a result, it is impossible to determine what happened to the Lebanon real estate proceeds.  Thus, the Court concludes that the Debtors failed to satisfactorily explain their loss of assets, namely the over $1 million in cash taken in by Mr. Mahfouz as reflected on the Cash Analysis introduced by the Trustee and the proceeds of the Lebanon real property transfers.  For all of the above stated reasons, the Court shall enter a judgment in favor of the Trustee and against the Debtors on the Fourth Claim for Relief of his Complaint.

## VII.   CONCLUSION

The Court shall enter judgments in this consolidated adversary proceeding in favor of the Trustee and Rockland and against the Debtors on the Second and Fourth Claims for Relief of the Trustee's Complaint and Counts I and II of Rockland's Complaint.  In view of the foregoing, the remaining claims for relief in the Trustee's and Rockland's Complaint are moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: April 16, 2015